UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re:

                                     Chapter 7

DIAMOND FINANCE CO., INC.,              Case No. 20-71877-reg

                       Debtor.
-------------------------------------------------------------------x
MARC PERGAMENT, Chapter 7 Trustee of the Estate of
Diamond Finance Co., Inc.,                Adv. Proc. No. 21-08101-reg

                     Plaintiff,

        - against –

TORAC REALTY, LLC,

                    Defendant.
-------------------------------------------------------------------x

## <u>DECISION AFTER TRIAL</u>

      This matter is before the Court pursuant to an adversary proceeding brought by Marc

Pergament, the chapter 7 trustee (the "Plaintiff" or the "Trustee") to recover from Torac

Realty, LLC ("Torac" or the "Defendant"), *inter alia*, a series of transfers by the Debtor and two

affiliates of the Debtor as intentional and constructive fraudulent conveyances under the New

York Debtor and Creditor Law ("NY DCL") and § 548 of the Bankruptcy Code. While the

adversary proceeding is against an entity that received transfers from the Debtor and its affiliates,

the type of operation the Debtor was engaged in, including the intent of the Debtor when making

the transfers to the Defendant, is an important piece of this adversary proceeding for several

reasons.

      The Debtor and the affiliated companies, which were owned and controlled by Mr.

Robert Diamond, were presented to the public as an automobile financing company for car

purchasers with less than stellar credit. The Debtor could charge high interest rates for these car loans due to the purchasers' lackluster credit ratings, and the costs of its operations would be borne by the difference between these high interest rates and the interest rate the Debtor incurred to borrow funds for its operations. The problem with the Debtor's business model was that the Debtor did not collect sufficient funds from the car purchasers to cover its operations, let alone make a profit. After losing credit lines with institutional lenders, the Debtor turned to friends and family to fund the Debtor's operations by promising a steady rate of return of 10% interest, paid at regular monthly intervals. The Debtor's principal boasted to the investors that his business was very successful and was growing every year. The Debtor's principal was also using the Debtor as the central entity which operated its affiliates to further its investment strategy. While the complete reason the Debtor's principal transferred funds in and out of the related entities remains unanswered, it did serve the purpose of creating an illusion of profitability for the investors. What these investors did not know was that the Debtor's business was losing money every year in ever increasing numbers, and the number of investor dollars had to increase each year just to make the monthly interest payments to the investors. This is commonly known as a Ponzi scheme. In addition to using the investor funds to run the Ponzi scheme, a significant amount of funds was transferred from the Debtor to Auto City International, Inc., which ran a used car dealership. While it appears that these funds disappeared from Auto City International, Inc. and most likely cycled back to the Debtor's principal and his family members, this adversary proceeding does not concern the ultimate whereabouts of these funds.

The Trustee seeks to take advantage of the Ponzi label to establish elements of fraudulent intent by the Debtor and the general insolvency of the Debtor for the purposes of proving that the transfers to Torac were intentional and constructive fraudulent conveyances, as alleged in the

complaint. While the Debtor did have some actual business, the purpose of the business quickly became a front to lure unsuspecting investors to invest with the Debtor. Without the patina of a legitimate business, the Ponzi operation would fail. The Debtor's principal knew this and used the business for these purposes, but unlike Bernard Madoff and others engaged in similar activity, he did not admit to operating a Ponzi scheme. Rather, he claimed he was attempting to save the business. After a three-day trial, the Trustee has not only established that this was a Ponzi scheme, but he has successfully established each cause of action set forth in the complaint.

Torac, which is the recipient of the transfers the Trustee seeks to recover, relies largely on its claim of innocence to the entire fraud. If the evidence supported a finding that Torac was either a regular good faith lender or an innocent investor which was duped along with all the other investors, Torac may have successfully sought to retain some portion of the transfers under the constructive fraudulent conveyance claims. However, the record reflects that Torac was not an innocent investor. Torac, which provided loans to the Debtor and its affiliates, played a different role than the other investors and was treated differently with respect to how it invested in the business and how it was repaid. Torac was aware of too many irregularities and red flags to retain the funds the Trustee seeks to recover. Torac's principal, who had an ownership interest in one of the transferring entities and was a close friend of the Debtor's principal, asked no questions regarding the Debtor's operations. Torac was also aware that the Debtor's lines of credit with institutional lenders had been cancelled and still claims it asked no questions. Torac and its principal were also the only investors which were repaid in full plus interest, while every other investor lost the bulk of their principal investment. For these reasons, Torac cannot assert a defense of good faith either as a lender or as a recipient of the funds.

## PROCEDURAL HISTORY

On April 14, 2020 ("Petition Date"), an involuntary bankruptcy petition ("Petition") was filed under chapter 7 of the United States Bankruptcy Code against the Debtor. ECF No. 1.[1] On May 20, 2020, an order for relief under chapter 7 was entered. Thereafter, the Trustee was duly appointed and qualified as the chapter 7 trustee. ECF. No. 23.[2] The Trustee commenced this adversary proceeding on May 20, 2021 by the filing of a complaint ("Complaint"). ECF No. 1.[3] The Complaint alleges various causes of action under 11 U.S.C. §§ 544, 548, 550 and 551, as well as §§ 273, 274, 275 and 276 of the New York Debtor and Creditor Law (the "NY DCL"). ECF No. 1. On June 9, 2021, an answer ("Answer") was filed in which the Defendant substantially denied the Plaintiff's allegations and asserted various affirmative defenses. ECF. No. 5. No dispositive motions were filed. A three-day trial was held on October 24, 25, and 26 of 2022. The Plaintiff and the Defendant submitted post-trial briefs on December 16, 2022. ECF Nos. 81, 82. Thereafter, the adversary proceeding was marked submitted.

## FACTS

Unless otherwise noted, the facts are drawn from the Stipulated Facts annexed to the Joint Pretrial Memo, ECF No. 72, Ex. I ("Stipulated Facts"). Diamond Finance Co., Inc. (the "Debtor"), was organized as an auto financing company licensed to conduct business in New York. The Debtor was incorporated in 1988 and was wholly owned by Robert Diamond, who served as its president from 1988 until May of 2020.

The Debtor and other Relevant Parties

---

[1] This ECF reference is to the Debtor's docket in the chapter 7 bankruptcy case at 20-71877 ("Main Case").

[2] This ECF reference is to the Main Case.

[3] Unless otherwise noted, ECF references (including this one) are to the adversary proceeding docket, No. 21-08101.

1. <u>The Debtor</u>

The Debtor's purported business was to provide automobile financing targeting consumers who were generally unable to secure market-rate financing. The Debtor would purchase the installment sale contracts from dealers in these transactions. Pl.'s Ex. 88 at 13-14. The automobile purchaser would then make the required payments directly to the Debtor. *Id*. The business model required that the spread between the contract rate collected from the consumers on their car loans and the Debtor's cost of operations resulted in a net profit to the Debtor. The two critical aspects which made this business model unsustainable were that the Debtor's overhead expenses were significant, and the collectability of the loans was poor. The Debtor operated through its affiliate entities, Diamond FFP, Inc. and Diamond Finance Co. of New Jersey. Diamond Floor Plan Inc. and Auto City International, Inc. were related to the Debtor, but were described as engaged in floor plan financing and used car sales, respectively. Trial Transcript Day 1 ("Tr."), ECF No. 79, at 139. Each of these entities, including the Debtor, was controlled by Robert Diamond.[4] Trial Transcript Day 2 ("Tr. #2"), ECF No. 80, at 127-128.

2. <u>Diamond FFP, Inc. ("FFP")</u>

FFP was incorporated in 2014 and at its inception, was owned equally by Mr. Diamond and Thomas Weitzmann.[5] There is some dispute over when Mr. Weitzmann had fully relinquished his ownership in FFP. However, the record reflects that by 2016, Mr. Weitzmann no longer had an equity interest in FFP based on FFP's 2016 income tax return.[6] FFP had little to no

---

[4] Mr. Diamond was called as a witness at trial; however, he asserted his rights under the Fifth Amendment for substantially all questions.

[5] Thomas Weitzmann is one of the principals of Torac Realty, LLC.

[6] It was Mr. Weitzmann's understanding that FFP was "terminated" (i.e., dissolved) shortly after its formation. Tr. #2 at 187. According to him, Mr. Diamond advised that Mr. Weitzmann would not remain as an owner of FFP. Mr. Diamond and Mr. Weitzmann were respective 50% owners of FFP as of February of 2014. According to FFP's income tax return for the year end December 31, 2016, Mr. Diamond was listed as its 100% owner. Pl.'s Ex. 60.

function other than raising capital by issuing notes to individuals solicited by Mr. Diamond. Tr. at 98; Tr. #2 at 73. It had no payroll or office space. Tr. at 98. FFP was also an affiliate of the Debtor that was listed on its combined financial statements. Tr. at 144.

3.  Diamond Finance Co. of New Jersey ("DFC-NJ")

DFC-NJ was incorporated in 1992 and was licensed by the State of New Jersey Banking Department. DFC-NJ was wholly owned by Mr. Diamond and was included on the Debtor's consolidated financial statements. Like the Debtor, DFC-NJ was also ostensibly in the auto financing business. Tr. at 98. DFC-NJ had no independent employees or office space.

4.   Diamond Floor Plan Inc. ("Floor Plan")

Floor Plan was incorporated in 2016 for the purpose of providing financing to auto dealers to purchase automobiles for eventual sale. This is generally termed inventory financing. Tr. at 99, 103. Floor Plan held title to the vehicles purchased by the dealers as collateral, until they were sold. *Id.* at 107. When the vehicles were sold, the dealer was required to pay the outstanding loan attributable to the auto which included interest and fees, thereby generating profits to Floor Plan. *Id.* at 112. Floor Plan was initially marginally profitable until it became unable to pay its expenses and service its own debt. *Id.* at 96-97; 114. Floor Plan was always owned and controlled by Mr. Diamond through at least 2019. Floor Plan was not treated as a related entity on the Debtor's consolidated financial statements. Pl.'s Ex. 88 at 19, 35.

5.  Auto City International, Inc. ("Auto City")

Auto City was incorporated in 1971 and was wholly owned and controlled by Mr. Diamond from 2013 through 2019. Auto City was a used car dealership located in the Bronx, New York. Auto City was not treated as a related entity on the Debtor's consolidated financial statements. *Id.* at 36.

6

6.   Torac Realty, LLC ("Torac" or "Defendant")

Torac was the Debtor's landlord. Tr. at 99-100. Torac is a New York limited liability company based in New Hyde Park, New York. Torac owns the real estate located at 2200 Marcus Avenue, New Hyde Park, New York where the Debtor was a tenant. Mr. Weitzmann was one of Torac's principals.[7] Mr. Weitzmann and Mr. Diamond were close friends since childhood. Tr. #2 at 145.

The Debtor's Downward Financial Spiral

From 2011 onward, the Debtor's business of financing auto loans was in poor financial shape which worsened as the years progressed. Pl's Ex. 1. This business no longer generated a profit as of at least 2011. *Id.* From April of 2014 through April 2020 ("Insolvency Period"), the Debtor consistently experienced negative cash flow from its operations. According to Gabe Shurek, the Plaintiff's expert witness, the Debtor was insolvent[8] at the end of each month during the Insolvency Period.[9] Tr. at 144. For the years 2011 through 2017 and 2019, the Debtor's consolidated financial statements showed negative net cash balances. Pl.'s Ex. 2. These negative balances ranged from ($33,954) to ($490,459). *Id.* To prop up its flagging business, the Debtor needed another source of funding. At some point in 2010, Mr. Diamond turned to his friends to invest in the Debtor.

---

[7] Torac had four principals, Thomas Weitzmann, Cindy Weitzmann, Mark Rosner and Leslie Rosner.
[8] Mr. Shurek's definition of "insolvent" is when liabilities exceed assets at fair valuation. Tr. at 18.
[9] At trial, the Defendant objected to Mr. Shurek's "Expert Report" as well as several other exhibits that Mr. Shurek created in his analysis as to the Debtor's financial information and as to whether the Debtor exhibited characteristics of a "Ponzi scheme." This Court admitted the exhibits into evidence for the purposes of allowing to Mr. Shurek to testify as to what he relied on in creating his report. This Court ruled that those specific exhibits would not necessarily be admitted for their truth and would be subject to cross-examination and interpretation of their contents. Mr. Shurek was subject to cross-examination by the Defendant, and the cross-examination failed to provide a basis to refute much of the financial information upon which Mr. Shurek relied. The Defendant also failed to provide its own expert witness. The Court utilized the financial information to reach its own conclusions as to the issues presented in this case, including whether the Debtor operated a Ponzi scheme.

Two of Mr. Diamond's close friends, who were investors, testified at the trial. Wayne Wattenberg and Gary Moskowitz each had a similar story to tell. Mr. Moskowitz invested with Mr. Diamond because he trusted him and was told that his money would be used in the automobile financing business to fund loans made to consumers who were deemed poor credit risks, and would need to pay higher interest rates for their automobile purchases. Tr. at 27. Mr. Diamond represented to him that the Debtor would charge 24-26% interest on the notes and after deducting its own expenses, the Debtor could afford to pay Mr. Moskowitz a 10% annual return on his investment. *Id.* As early as 2010, Mr. Moskowitz began investing in the Debtor. *Id.* at 26. Mr. Moskowitz made his investments based on Mr. Diamond's representations that "business was fabulous" and "business was booming" and that he could buy significantly more car loans if he had more investor money. *Id.* at 30, 31. Because of these representations and his close friendship with Mr. Diamond, Mr. Moskowitz felt comfortable investing in the Debtor. Whenever Mr. Diamond asked for more money, Mr. Moskowitz obliged. *Id.* at 31. Mr. Moskowitz received interest payments on time, every month, until February of 2020, when he received a letter that Mr. Diamond had to stop making interest payments due to the COVID-19 pandemic. *Id.* at 32-33. At some point after that, Mr. Moskowitz was alerted by another investor that he believed the Debtor had been losing money for years and had a negative net worth. *Id.* at 34. Mr. Moskowitz lost a total of $850,000 from his investments in the Debtor. *Id.* at 40.

Wayne Wattenberg, who was also a close friend of Mr. Diamond, testified with a similar story. Mr. Wattenberg first invested with Mr. Diamond around 2012 or 2013. *Id.* at 45. Mr. Diamond explained his business of providing loans to consumers to purchase cars and his used car business. *Id*. He told Mr. Wattenberg that he had an opportunity for some of his friends to make a 10% return on their money with zero risk because he held titles to the cars as collateral

and was getting paid 25% interest from the consumers purchasing cars. Mr. Diamond always said that business was very good. *Id.* at 46. Mr. Wattenberg invested a total of $360,000 with Mr. Diamond, and at one point was receiving about $3,000 per month in interest payments based on a 10% annual interest rate. *Id.* at 47, 50; Pl.'s Ex. 53. Mr. Diamond solicited other investors to invest with him, including Mr. Wattenberg's son, who invested $240,000. Tr. at 47-48. At some point in time after the COVID-19 pandemic, a friend advised Mr. Wattenberg and his son that he believed Mr. Diamond's business was not legitimate. *Id.* at 55. Mr. Wattenberg and his son lost $360,000 and $240,000 in principal, respectively. *Id.*

The Debtor's False Representations to Regulators and Investors

It became increasingly apparent that the Debtor was not succeeding, despite the influx of investor money year over year. As the pool of investor funds increased, so did the monthly note obligations, while the Debtor's business continued to operate in the red. Donald Kalechofsky, the Controller at Floor Plan, advised Mr. Diamond that based on the financial picture of the Debtor, FFP and DFC-NJ in 2017, he should either "get rid of" the Debtor and these affiliated companies, cease operations or increase the loan base. *Id*. at 109, 121-22. The basis for this recommendation was that the Debtor consistently had negative income after paying interest on the investors' notes and covering its operational expenses. *Id.* at 122-25; Pl. Ex. 45. In essence, the Debtor's business of providing automobile financing to consumers with poor credit history was a failed strategy. The Debtor only continued to operate by securing a constant stream of new money through investor financing. Based on these facts, the Court concludes that the Debtor had morphed into a business whose only real purpose was raising money to pay its debt obligations to existing investors and its overhead.

Notwithstanding Mr. Kalechofsky's warnings, Mr. Diamond continued to operate the Debtor and the affiliate businesses without adequate sources of capital and in the face of increasing expenses. Mr. Diamond's response to these warnings was to continue to dig a deeper hole by raising money from investors through false representations that the Debtor was a highly profitable business and a safe investment. At no time did Mr. Diamond disclose the actual financial position of the Debtor, that it was losing money each year and that it could not survive without a constant stream of investor money. This story unfortunately is not a new one and the end is always inevitable: except for a chosen few, such as Torac in this case, everyone loses their money. Tr. at 30-33.

In an effort to generate an appearance of profitability, Mr. Diamond transferred funds between the Debtor and the affiliated entities. Much of the Debtor's financial information could not be reconciled,[10] as some end-of-year calculations differed from the starting numbers from the following year. Tr. #2 at 43. Mr. Kalechofsky had the accounting firm of Cerini & Associates LLP ("Cerini") retained to produce an audited financial statement for Floor Plan, which required audits of the Debtor and other affiliates of the Debtor. Tr. at 101. Cerini was unable to generate audited financial statements for Floor Plan because a significant number of the intercompany transactions could not be matched. *Id.*

Mr. Diamond not only misled investors, but he also provided false information to regulators as part of his scheme. The Debtor was required to file annual reports to the New York State Department of Financial Services ("DFS"), which reviewed the reports. During the

---

[10] This refers to the "reconciliation of equity." A company's retained earnings is its opening number on its balance sheet, and after the addition of any income (or loss) and/or any distributions or contributions, leaves an ending retained earnings number. That ending retained earnings number should then carry forward to the subsequent statement as the opening number. In the Debtor's case, those numbers did not always match up. Tr. #2 at 43.

Insolvency Period, the Debtor had made misrepresentations in its annual reports to the DFS ("DFS Annual Reports"). Among other things, the DFS Annual Reports showed "short-term funds borrowed from banks." Pl.'s Exs. 15, 16, 17, 19, 20, 21. According to the testimony of Mr. Shurek, however, these funds were not funds from banks, but rather were funds borrowed from investors Mr. Diamond had preyed upon, like Mr. Moskowitz and Mr. Wattenberg. Tr. at 170. Notably, according to the DFS Annual Reports, the Debtor showed "short term funds borrowed from other creditors" to be zero. Pl.'s Exs. 15, 16, 17, 19, 20, 21. The Debtor was financed by investor notes, which should have been listed in this section of the DFS Annual Reports instead of being reported under funds from "banks." Tr. at 170.

The Debtor also made false statements to DFS regarding its financial condition. This included reporting millions of dollars in advances to Auto City as "advances to dealers," which should have roughly matched the value of car loans initially made by Auto City and transferred to the Debtor. However, they were essentially one-way payments without the Debtor receiving the corresponding loan documents to collect from the consumer borrowers. Pl.'s Ex. 88 at 68-72. These advances were listed on the DFS Annual Reports and were misrepresented by the Debtor as "receivables" that would be paid back. Pl.'s Exs. 15, 16, 17, 19, 20, 21; Tr. 160-62. The conclusion to be drawn is that Auto City used these funds for purposes other than making advances to dealers. Tr. #2 127. Specifically, Auto City listed "Diamond Florr Pl" as a "Payee" or recipient of substantial payments from April 2018 to October 2019. Pl.'s Ex. 1 at Ex. I. These disbursements from Auto City totaled $2,280,627.17. *Id.* When analyzing these transactions, Mr. Shurek could not find a corresponding entry reflecting receipt of such funds on Floor Plan's books. Tr. #2 at 39. During the Insolvency Period, the Debtor made transfers to Auto City aggregating $3,572,064, of which Auto City provided $228,382 back to the Debtor, leaving a net

total of $3,343,682 in Debtor transfers to Auto City. Between April 2014 through April 2018, a total of 299 transfers to Auto City were made aggregating $3,054,680. Nearly all of those transfers were in numbers rounded to the nearest thousand. Pl.'s Ex. 88 at 69; Pl.'s Ex. 1. During that period, only twelve transfers totaling $10,720.52 were remitted back from Auto City to the Debtor. Notwithstanding the Debtor's deepening losses year after year, the "advances to dealers" increased almost every year during the Insolvency Period. Pl.'s Ex. 2. The Debtor and Floor Plan also transferred funds back and forth for no discernable business purpose. For instance, Floor Plan had received a private loan of approximately $12,500,000 in 2017 shortly after its incorporation, and some of the loan proceeds were transferred in part to the Debtor to cover its operations. Tr. #2 at 24. Sometime in 2018, the Debtor's expenses were shifted over to Floor Plan. *Id.* at 24-25. Mr. Shurek testified that millions of dollars were transferred in and out of Floor Plan's account, yet Floor Plan had minimal actual income. *Id.* at 23. This included transfers by Floor Plan to the Debtor in the amount of $3,503,143 and transfers from the Debtor to Floor Plan in the amount of $2,015,682. Pl.'s Ex. 1. The transfer of funds between various affiliated entities, for no apparent business purpose, helped to create an illusion of financial strength amid the Debtor's deepening insolvency. The false reports and the transferring of funds with related entities are not random independent actions. Mr. Diamond committed these acts as part of a conscious scheme to perpetuate the fraud he orchestrated. He financed the fraud by running the Ponzi scheme. It is important to distinguish the underlying fraud of misrepresentation to investors and filing false documents with how Mr. Diamond financed these actions. It is the Ponzi scheme, fueled by the false representations, which is critical to the underlying fraudulent conveyance claims.

Throughout the Insolvency Period, even as its financial condition further deteriorated, the Debtor continued to be used as a vehicle to raise money from investors. Mr. Diamond asked Mr. Wattenberg to refer investors to him, especially his son's wealthy friends. Tr. at 49. Mr. Diamond enticed some investors with the payments of commissions for successfully recruiting new investors into the scheme. For example, Mr. Diamond had written agreements with Jerome Krantz and Steve Fox to recruit new investors. Jerome Krantz would receive a 2% commission on each investor that was brought into the scheme and an additional 2% on any investor's renewal of their loan. Pl.'s Ex. 6. Mr. Krantz brought in a handful of investors, totaling eight loans for which he was owed a commission. *Id.* Likewise, Steve Fox would receive a 5% commission on any investor he brought into the scheme. Pl.'s Ex. 7. In fact, according to Francine Haviken, the Debtor's bookkeeper, the Debtor's issuance of promissory notes to raise money from investors was the primary source of the Debtor's income. Pl.'s Ex. 88 at 21. During the Insolvency Period, the Debtor received loans from investors totaling $12,535,000. Pl.'s Ex. 1. Even though the Debtor's operations rendered it insolvent from at least 2014 to 2019, the Debtor paid out principal and interest payments to investors in the total amount of $12,648,115. *Id.* Ms. Haviken also testified that because the Debtor operated at a loss, the Debtor needed to borrow money to pay its bills and make the interest payments. Pl.'s Ex. 88 at 42. The "interest expenses" listed in the Debtor's financials were the expenses for all the funds that Mr. Diamond had borrowed, and which money went to pay individual investors. Tr. at 119-20. Mr. Kalechofsky testified that the money the Debtor raised from investors was used to pay this "interest expense" which was the largest expense on the Debtor's books during Mr. Kalechofsky's employment. *Id.* at 121, 128. The record reflects that to cover its expenses, which included its overhead and repayment to investors, the Debtor needed to borrow additional money from investors or find

new investors. *Id.* at 128. Because it had to continue borrowing to pay back other investors, the Debtor's loans and "notes payable" on its consolidated balance sheet increased every year. *Id.* at 145; Pl.'s Ex. 2.

Transfers to Torac

While Mr. Moskowitz and Mr. Wattenberg had very similar experiences with their investments in the Debtor, Torac's experience differed in several significant aspects. From about 2013 to 2014, Torac made five separate loans to the Debtor, two separate loans to DFC-NJ, and one loan to FFP. Pl.'s Exs. 9, 10, 12. These loans totaled $740,000.00 in the aggregate. Pl.'s Exs. 9, 10, 12. Torac made loans to the Debtor in the amount of $240,000 on September 24, 2013, $75,000 on January 24, 2014, $25,000 on January 31, 2014, $50,000 on April 18, 2014, and $30,000 on September 9, 2014. Torac made loans to DFC-NJ in the amount of $100,000 on April 16, 2014 and $120,000 on June 18, 2014. Lastly, Torac made a loan to FFP in the amount of $100,000 on July 16, 2014. Pl.'s Exs. 9, 10, 12.[11] The notes evidencing these loans either carried 10% annual interest or did not indicate an interest rate. Torac did not receive consistent monthly payments of interest, but instead received payments in varying amounts which, in the aggregate, greatly exceeded Torac's investment. The return of $1,322,714 on an investment of $740,000 over a little less than five years reflects an interest rate in excess of 10%. The Defendant has offered no explanation for this drastic difference in the treatment of Torac's investment from the other investors.

When making loans to the Debtor, Mr. Weitzmann did not differentiate between the Debtor, DFC-NJ, FFP, or Mr. Diamond, as he considered them all to be one in the same i.e., "Rob Diamond." Trial Transcript Day 3 ("Tr. #3"), ECF No. 78, at 17-18. Mr. Weitzmann never

---

[11] Notably, this investment in FFP occurred after the date Mr. Weitzmann testified FFP ceased operations.

asked to review the Debtor's books and records or any financial information about the Debtor, and never conducted due diligence of any kind before or after making the loans. Tr. #2 at 178-79. According to Mr. Weitzmann, all the inducement he needed was for Mr. Diamond to claim that "business was good." With respect to FFP, Mr. Weitzmann acknowledged he owned 50% of the stock of FFP when it was formed in early 2014, but claimed he was only involved with this business for a few months thereafter. *Id.* at 184-87. Mr. Weitzmann believed that FFP was to be funded by his and Mr. Diamond's personal funds, but he was not aware whether Mr. Diamond put any of his own funds into FFP. Mr. Weitzmann also claimed to have no idea how FFP obtained the money to pay Torac, nor was he fully aware what business FFP was engaging in when he transferred funds to FFP. Tr. #3 at 11. With respect to FFP, Mr. Weitzmann claimed that Mr. Diamond showed him some handwritten papers which listed cars FFP was financing along with their registration numbers. *Id.* at 13-14. Mr. Weitzmann had no explanation as to how FFP could have repaid Torac $190,000 on an initial investment of $100,000 or how the bulk of these transfers to Torac could have taken place well after Mr. Weitzmann believed FFP had ceased operating. However, Mr. Weitzmann was also aware that Mr. Diamond was transferring funds among the Debtor, FFP and DFC-NJ. *Id.* at 10-11. Out of over thirty investors who loaned funds to the Debtor, only Mr. Weitzmann and Torac were paid back in full including interest. Tr. #2 at 157, 176; Tr. #3 at 15. When viewed together, the conclusion drawn by the Court is that Torac had knowledge that the Debtor's operations were being propped up by innocent investors and Torac received a substantial return on its investment at the expense of these investors.

The Plaintiff seeks to recover a total of $1,322,714 from Torac, which includes principal and interest. Of this amount, there are three groups of transfers which were either not made by the Debtor or were not received directly by Torac. However, the principal source of these funds

and all funds distributed by the Debtor and its affiliates were the investors as previously detailed.

Because Mr. Diamond used DFC-NJ and FFP to make distributions, the Debtor was

shortchanged based on what Torac invested directly with the Debtor ($420,000) and what Torac

received from all sources ($1,322,714). Pl's Ex. 1. However, for reasons set forth below, the

Court is viewing all of the transfers as between the Debtor and Torac. The specifics of these

groups of transfers are described below.

1. Transfers from FFP to Torac

On July 16, 2014, the Debtor and Torac executed a promissory note in the amount of

$100,000. Pl.'s Ex. 68. Even though the Debtor was the payee, the funds were wired into FFP's

bank account. *Id*. Similarly, FFP repaid Torac. *Id.* Torac received a total of $190,000 from the

$100,000 investment. Pl.'s Ex. 12; Tr. #3 at 15. The majority of funds deposited into FFP during

the time of these transfers were attributable to the Debtor, totaling $325,000 or 66%. Pl.'s Ex.

13; Tr. #2 at 75. Additionally, $84,000 or 17% came from DFC-NJ; $50,000 or 10% came from

an investor named Joe Dinola; $25,000 or 5% from an investor named Jerome Krantz; and

$5,954 of deposits from unknown sources. Tr. #2 at 75. Therefore, $409,000 of the $489,954 in

receipts to FFP were either from the Debtor or from DFC-NJ. *Id*. Of the sixteen payments

provided from FFP to Torac, Mr. Shurek was able to trace seven transactions totaling $90,000

directly from the Debtor to FFP. *Id.* at 74.

2. Transfers from DFC-NJ to Torac

During the period September 24, 2013 through November 2, 2017, DFC-NJ disbursed

$320,326 to Torac. This amount included a payment of $150,000 from DFC-NJ to Torac which

Torac used for the purchase of a commercial building. Pl.'s Ex. 11; Tr. #2 at 99, 150. Mr.

Weitzmann testified that around the summer of 2015, Torac requested repayment of its loans to

the Debtor so that it could purchase the building immediately. Tr. #2 at 150. Torac also reached

out to James Brettholz, a friend of Mr. Weitzmann and another creditor of the Debtor, to loan

money to Torac. *Id.* On June 4, 2015, Mr. Brettholz wired $150,000 into DFC-NJ.[12] On that

same day, an outgoing payment in the amount of $150,000 was received by Torac. Pl.'s Ex. 11;

Tr. #2 at 99, 100. From 2014 to 2018, Torac paid a total of $220,000 to DFC-NJ. Pl.'s Ex. 10.

During the time the transfers were made, DFC-NJ had $4,011,010 in cash receipts. Pl.'s Ex. 1.

This amount included $1,512,598 or 38% from unknown sources; $1,055,648 or 26% from the

Debtor; $950,764 or 24% from investor loans; $200,000 or 5% from Mr. Diamond; $192,000 or

5% from FFP; and $100,000 or 2% from Floor Plan. *Id.* In his analysis, Mr. Shurek reviewed the

monies that went into DFC-NJ during this period and could trace five payments totaling $38,270

from the Debtor. *Id.*; Tr. #2 at 70.

3. <u>Transfers from the Debtor to Basic Capital Corp.</u>

The record reflects that Torac transferred a total of $420,000 to the Debtor. Pl.'s Ex. 9. In

turn, the Debtor made payments to Torac and/or an entity named Basic Capital Corp.[13] ("Basic

Capital") totaling $812,387.46.[14] *Id.* Of this amount, the Debtor transferred $195,350.01 to Basic

Capital. The Debtor made payments to Basic Capital at the direction of Mr. Weitzmann.

According to Mr. Weitzmann's testimony, the Debtor made these transfers to Basic Capital for

the benefit of Mr. Weitzmann, not the Debtor. Mr. Weitzmann claims he personally loaned the

---

[12] Mr. Weitzmann alleged that Mr. Brettholz accidentally wired the $150,000 to DFC-NJ instead of directly to Torac. Tr. #2 at 150. Mr. Weitzmann testified that because he needed the funds immediately, the parties agreed that it was simpler to wire the funds directly from DFC-NJ to Torac instead of having DFC-NJ wire the funds back to Mr. Brettholz, to then wire it directly to Torac. *Id.* at 151-152. Mr. Weitzmann admitted that this transfer was for his benefit. *Id.* There is no testimony from Mr. Brettholz's to corroborate Mr. Weitzman's explanation, nor is there any evidence that Brettholz was repaid by Torac or Weitzmann.
[13] Basic Capital is a California corporation controlled by Mr. Weitzmann's brother-in-law.
[14] The Debtor disbursed $617,037.45 to Torac, and an additional $195,350.01 to Basic.

Debtor $350,000 in 2009. Tr. #2 at 147-48.[15] Around December of 2012, the building owned by Torac was at risk of foreclosure due to the nonpayment of real estate taxes. Mr. Weitzmann first sought repayment of his loan to the Debtor to cover Torac's tax debt. *Id.* at 148. Mr. Diamond was unable to immediately repay Mr. Weitzmann, so Mr. Weitzmann turned to his brother-in-law, who ran Basic Capital, for a loan. *Id.* Basic Capital agreed to loan Torac $350,000. *Id.* at 183. As partial repayment of the debt to Basic Capital, Mr. Weitzmann and Basic Capital agreed to assign the note between Mr. Weitzmann as obligee and the Debtor as obligor. Pl.'s Exs. 62, 63. Basic Capital subsequently wired $350,000 to Torac, and Mr. Weitzmann testified that the funds were used to satisfy a tax lien on Torac's property in the approximate amount of $311,000 as well as some delinquent mortgage obligations. Tr. #2 at 148. The Debtor made payments to Basic Capital in the amount of $20,000 per month for a total of approximately $195,350. *Id.* at 149. Mr. Weitzmann paid the remaining balance on the note to Basic Capital and the Debtor resumed repaying the last $100,000 of its obligation to Weitzmann by making transfers to Torac. *Id*.

## DISCUSSION

### I.     The Debtor Operated as Ponzi Scheme

The Plaintiff and the Defendant present widely diverging images when describing the true nature of the Debtor's business. The success of certain elements of the Plaintiff's adversary proceeding turns in part on whether the Court finds that the Plaintiff has established that the Debtor was operating a Ponzi scheme, by using its business to lure investors. In contrast, the Defendant urges the Court to find that the Debtor's business was legitimate, but it ran into financial difficulty which created a need to seek another source of funding for its operations. The

---

[15] The note evidencing this debt was not produced by the Defendant and is not part of the record.

benefit to the Plaintiff in finding that the Debtor was running a Ponzi scheme is twofold: a Ponzi finding would establish the transferor's intent to defraud, and it would establish the insolvency of the Debtor. *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 104, 110 n. 15 (Bankr. S.D.N.Y. 2011) (other citations omitted),

The Debtor's fraudulent intent is a requirement under the intentional fraudulent conveyance statutes and a finding of the Debtor's insolvency is a component of the constructive fraudulent conveyance actions. Because the fourth, fifth and ninth causes of action concern intentional fraudulent transfers, a finding that the Debtor operated a Ponzi scheme would satisfy a critical element of these claims. The first, second, third and eighth causes of action require a finding of the Debtor's insolvency, which would be established by the Ponzi presumption as well.

The evidence and applicable case law supports the Plaintiff's proposition that the Debtor was running a Ponzi scheme for the entire period that Torac received the transfers at issue. The Debtor's business, which was unprofitable from 2008 onward, became nothing more than window dressing for the fraudulent acts committed to benefit the Debtor, its principal and Torac.

While there is no precise definition of what constitutes a Ponzi scheme, it always involves a fraudulent stratagem to solicit new investors whose funds are then used primarily to make distributions to earlier investors. "[T]he label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud." *Bear Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 12 (S.D.N.Y. 2007) (quoting *Bayou Superfund LLC v. WAM Long/Short Fund II, LP (In re Bayou Group, LLC)*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007)). "A key factor is that the Ponzi

schemer requires—and secures—new investors to keep the sham arrangement afloat." *Id.* at 12. A Ponzi scheme can involve a corporation that operates at a loss, while giving the appearance of profitability to draw in new investors to cover the returns promised to earlier investors. *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088 n. 3 (2d Cir.1995). "A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." *Eberhard v. Marcu,* 530 F.3d 122, 132 n. 7 (2d Cir. 2008). In this case, the collapse was accelerated by the COVID-19 pandemic. However, an irrefutable fact common to all such schemes is that they ultimately fail and result in significant loss to their investors. This case is no different.

Some courts employ the following "four-factor test" to determine whether a Ponzi scheme existed: "1) deposits were made by investors; 2) the [d]ebtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors." *Sec. Inv'r Protec. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015) (citing *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Adv. P. No. 10–03493, 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014)). ₁

Other courts have identified "badges of fraud" to determine whether a Ponzi scheme has been established, including "the absence of any legitimate business connected to the investment program, the unrealistic promises of low risk and high returns, commingling investor money, the use of agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, the 'payment' of excessively large fees to the perpetrator and the use of false financial

statements." *In re Dreier LLP*, 2014 WL 47774, at *9. These badges are, however, not the sole markers of a Ponzi scheme, which can be present in many forms. *Id.*

Because there is no single, precise definition of a Ponzi scheme, courts will look for a general pattern, rather than specific hallmarks, to make its determination. *See In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 12. A "clever twist on the Ponzi concept will not remove a fraudulent scheme from the definition of Ponzi." *Forman v. Salzano (In re Norvergence, Inc.),* 405 B.R. 709, 730 (Bankr. D.N.J. 2009).

This case presents a distinction that is not always present in Ponzi schemes. Unlike the well-chronicled Madoff case and other noteworthy Ponzi schemes where there is some form of allocution or a conviction confirming the existence of the scheme, that is not the case here. Mr. Diamond has not admitted to operating the Debtor as a Ponzi scheme. However, the facts and the record before the Court support a finding that the Debtor was operated as a Ponzi scheme at the direction and for the benefit of Mr. Diamond and his other companies. Application of the four-factor test to the facts of this case yields a result consistent with a Ponzi finding.

(1) <u>Deposits were made by investors</u>

It is undisputed that the Debtor took in a total of $12,535,000 in loans from investors. The Defendant argues that these lenders should not be considered "investors" in the context of a Ponzi scheme because the funds obtained by the Debtor were in the form of loans, not equity. Def.'s Post-Trial Br. at 22. Attempting to provide a legal distinction, the Defendant emphasized at trial that Mr. Wattenberg and Mr. Moskowitz did not purchase any equity in the Debtor. Tr. at 42, 58.

No such distinction preempts a finding of a Ponzi scheme. Whether an individual or entity makes a loan or purchases equity, it can be characterized as an "investor" in the context of

a Ponzi scheme. *See Sec. Inv'r Protec. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp.

3d 219, 238 (S.D.N.Y. 2021), *aff'd sub nom. Picard Tr. for SIPA Liquidation of Bernard L.*

*Madoff Inv. Sec. LLC v. JABA Assoc. LP*, 49 F.4th 170 (2d Cir. 2022) (finding that the

defendants were "investors" regardless of whether they were creditors or equity investors, where

the defendants expected a high rate of return which return was obtained by the use of fraud). ‼

     (2) <u>The Debtor conducted little or no legitimate business operations as represented to investors</u>

     The Defendant's central argument to refute the Trustee's conclusion that the Debtor

operated a Ponzi scheme is that the Debtor's business may have been troubled, but it was always

legitimate. The Defendant claims it was unprofitable because its profit margin was too small, and

this could be made up by increasing the number of loans made. The Defendant cites to the

testimony of Mr. Kalechofsky, who stated that the spread between the interest rates that the

Debtor would borrow at and the rate of interest it earned was insufficient to carry the expenses of

the company. Tr. #2 at 96. The Defendant argues that it was profitable until bank lines were

pulled in 2008, plus its customer base dwindled. *Id.* at 93-95. To save the business, Mr. Diamond

used the borrowed investor funds for the purpose of generating more loans with the intent of

generating a profit. Tr. at 130. However, this scenario does not fit the facts. Mr. Diamond

blatantly lied to his investors about the performance of his business. A review of the transactions

show that investor funds were repeatedly transferred between the Debtor and its various affiliate

entities in a manner for which Mr. Kalechofsky could not give a rational explanation. As a matter

of fact, Mr. Kalechofsky attempted to try and prepare tax returns but was "unable to get a good

set of books." *Id.* at 104. When he advised Mr. Diamond of the discrepancies between the

intercompany transfers, he "never got a great answer on why it didn't match." *Id.* at 105.

Significantly, Mr. Kalechofksy brought in Cerini to conduct an audit of the financial statements

to attempt to match the transactions. However, Cerini was unable to accomplish this. *Id.* at 101.

Clearly, this complex web of intercompany transactions was a scheme to take funds from

investors, shuttle the funds to and from the Debtor and its entities to create a false narrative of

profitability, and then to use those funds to pay back earlier investors. The increase in investor

funds did not make the Debtor's operations more profitable as the bulk of these funds either went

to benefit the principal and the Debtor's affiliates or went towards making the monthly interest

payments to investors. The Debtor performed this operation on a "rinse and repeat" basis until

the fraud was discovered.

The Defendant further emphasizes that the Debtor's operations were legitimate because

there was a sale of approximately $475,000 worth of the Debtor's assets to a third-party buyer in

the Main Case.[16] That argument also fails because the fragment of actual business is dwarfed by

the magnitude of the fraud, which brought in over $12 million in investor funds and required a

constant stream of new investor funds to make the monthly payments as promised by the Debtor.

The presence of a legitimate business will not defeat the finding of a Ponzi scheme. *See*

*Sec. Inv'r Protec. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d at 240 ("even if

part of [the debtor] engaged in legitimate business, it is common for a business to run a

legitimate business alongside a Ponzi scheme, and the presence of a legitimate business

alongside a Ponzi scheme does not undermine the Ponzi scheme presumption"); *Gillman v. Geis*

*(In re Twin Peaks Fin. Serv., Inc.),* 516 B.R. 651, 655 (Bankr. D. Utah 2014) ("The fact that an

investment scheme may have some legitimate business operations is not determinative. If the

debtor's legitimate business operations cannot fund the promised returns to investors, and the

---

[16] Order Granting Motion to Sell Property of the Estate Free and Clear of Liens under 11 U.S.C. § 363(f), ECF No. 241 in the Main Case.

payments to investors are funded by newly attracted investors, then the debtor is operating a Ponzi scheme").

Several courts have found that a Ponzi scheme existed notwithstanding claims that the existence of a legitimate business negated any finding of a Ponzi scheme. *See Cuthill v. Greenmark, LLC (In re World Vision Ent., Inc.),* 275 B.R. 641, 648 (Bankr. M.D. Fla. 2002) (finding that a "textbook Ponzi scheme" existed where the issuance of promissory notes was the debtor's primary source of funds and in which the debtor primarily used the funds from those notes to pay interest to previous investors and also to pay overhead, salaries, and expenses); *Rieser v. Hayslip (In re Canyon Sys. Corp.),* 343 B.R. 615, 628 (Bankr. S.D. Ohio 2006) (finding that the debtor's fraudulent operation of its gold coin business constituted a Ponzi scheme despite the transferee's claim that the debtor's business suffered from "bad timing rather than a lack of a legitimate business enterprise"); *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1272 (D. Utah 2015), *aff'd*, 632 F.App'x. 937 (10th Cir. 2015) (unpublished) (the defendant argued that the business was not a Ponzi scheme because it operated a real business, but the court stated it "misse[d] the point" because "Ponzi schemes sometimes use legitimate operations to attract investors, but the existence of that legitimate business does not preclude a finding that the company operated a Ponzi scheme"). !

The court's decision in *In re World Vision* reflect facts similar to this case. World Vision Entertainment, Inc. ("World Vision") promoted itself as an entertainment investment company and started selling nine-month promissory notes to investors at interest rates of 10-11%, where the investors could reinvest their principal at the end of the term. *In re World Vision Ent., Inc.*, 275 B.R. at 645-46. World Vision utilized a network of brokers to sell the notes, who were paid commissions on their sales. *Id.* at 646. It sold approximately $62 million worth of promissory

24

notes. The notes were marketed through a sophisticated program designed to foster the illusion of a successful venture. After reviewing the facts, the Court found:

> The debtor's note program was a textbook Ponzi scheme. None of the debtor's investments ever produced any income or revenue. The debtor's primary source of funds was through the sale of its promissory notes. The debtor used funds invested by new investors to make interest and principal payments to earlier investors. Any remaining funds were used to pay general and administrative expenses such as officer salaries and rent, to make occasional investments in companies not expected to generate any substantial return, and to enrich the debtor's insiders.

*Id.* at. 648-49.

The record reflects that the Debtor operated much the same. As time passed, the Debtor's primary source of funding its operations became the proceeds of the investor notes. Pl.'s Ex. 88 at 21. Despite its insolvency, the Debtor made payments of over $12 million to investors. Like the debtor in *World Vision*, the Debtor made substantial intercompany transfers, including payments to Mr. Diamond personally, which could not be reconciled or explained. This is especially apparent when examining the "advances" the Debtor made to Auto City. The Debtor transferred more than $3,572,064 to Auto City, receiving back only $228,382. In stark contrast to the Defendant's assertions of legitimacy, the Debtor's operations were much more appropriately classified as a sham.

(3) <u>The purported business operation of the Debtor produced little or no profits or earnings</u>

The Debtor operated at a severe financial loss for all relevant times during the Insolvency Period. Pl.'s Ex. 1. During this period, its operations consistently demonstrated negative net income, negative retained earnings, negative cash balance, insufficient liquidity, a dangerously high debt to equity ratio and had substantially overdrawn bank accounts. The Defendant places stock in the marginal profits experienced by the Debtor well before the Insolvency Period and

lays the blame for the Debtor's losses on the banks pulling the lines of credit in 2008. Def.'s Post-Trial Br. at 16. Because a business may not start as a Ponzi scheme does not mean it cannot *become* a Ponzi scheme. From at least 2014 onward, without a stream of new money or borrowing, the Debtor could not meet its existing obligations, interest payments, or debt service. Tr. at 149-50. It is the Debtor's conduct during the Insolvency Period which points to a Ponzi finding. As with the debtor in *World Vision*, "[e]very note sold simply made the debtor even more insolvent." *In re World Vision Ent., Inc.,* 275 B.R. at 647.

(4)  The source of payments to investors was from cash infused by new investors.

Finally, the record before the Court confirms that the payments the Debtor received from new investors were used to pay interest and principal to previous investors. During the Insolvency Period, the Debtor's loans increased every year, and it could not support this debt service without raising new money. Tr. at 145. At trial, Mr. Shurek stated that whatever significant funds remained after making advances to Auto City were needed to service the debt. After the debt to prior investors was serviced, the funds went toward overhead expenses. Tr. #2 at 50-51. Because the Debtor was in constant financial distress and its businesses operated at a loss, it could not make distributions to earlier investors without a consistent stream of new investor money. This is a classic hallmark of a Ponzi. *Sec. Inv'r Protec. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. at 472. Thus, the four-factor test is satisfied.

For these reasons as well, the Debtor also operated a Ponzi scheme within the more flexible confines of the standard adopted in *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 12 ("any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud").

II.     Torac's status as a lender does not insulate it from the Ponzi presumption

Torac contends that its status as a lender and not an investor insulates it from the Ponzi scheme entirely. To support its position, the Defendant cites to *Daly v. Deptula (In re Carrozzella & Richardson),* 286 B.R. 480 (D. Conn. 2002) and *Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*, 260 B.R. 343, 346 (Bankr. W.D.N.Y. 2001), *aff'd sub nom. In re Unified Com. Cap.*, No. 01-MBK-6004L, 2002 WL 32500567 (W.D.N.Y. June 21, 2002). These cases are unpersuasive and do not affect the Court's finding that the Ponzi scheme sufficiently establishes that the transfers were made with the intent to defraud, as discussed *infra*.

Both cases cited by the Defendant concern whether innocent investors can retain the interest they received on loans to a debtor which ran a Ponzi scheme. The focus of the inquiry in *Carrozzella* and *In re Unified Commercial Capital, Inc.* was whether the interest payments by such debtor could constitute "reasonably equivalent value." The court in *Carrozella* ultimately held that these returns were not recoverable as constructively fraudulent transfers where the defendants were good faith recipients. *Carrozzella,* 286 B.R. at 491-92. Likewise, the court in *In re Unified Commercial Capital, Inc.* held that the debtor received reasonably equivalent value within the meaning of section 548 of the Bankruptcy Code. *In re Unified Com. Cap., Inc.*, 260 B.R. at 354. However, in deciding the question, it assumed that the defendants had acted in "good faith" and repeatedly made references to them as "innocent investors." These cases do nothing to alter the Court's finding that the Debtor made the transfers to Torac with the intent to defraud investors.

In any event, the Defendant was by no means an innocent investor. Mr. Weitzmann, the Defendant's principal, was best friends with Mr. Diamond for many years. In fact, Mr. Weitzmann and Mr. Diamond were 50-50 owners in FFP when it was formed. At trial, Mr.

Weitzmann admitted that when Mr. Diamond asked for money, Mr. Weitzmann never asked any questions because they were friends. Tr. #2 at 158. Further, he never inquired into the Debtor's ability to pay him back, never performed any due diligence on the Debtor or Debtor's affiliates, and never asked to see the Debtor's financials. *Id.* at 178-79. Notably, when Mr. Weitzmann demanded repayment of one of its outstanding loans in August of 2015, the Debtor stated it was unable to pay Mr. Weitzmann back. Such a clear financial red flag would have caused any reasonable and innocent lender or investor to have commenced an inquiry or investigation into the Debtor, yet Mr. Weitzmann undertook no such action. *Id.* at 180. Their close relationship is evident when examining the Defendant's actions shortly before the involuntary bankruptcy. The Defendant wrote checks to Mr. Diamond totaling $75,000 to cover the cost of retaining an attorney for the involuntary bankruptcy. *Id.* at 172-73. When asked at trial if he expected to be repaid for that money, Mr. Weitzmann responded "No, I just - - I gave it to him so you know, I gave it to him because he told me that he needed it for the attorney. I didn't even discuss repayment." *Id.* at 178. Finally, the Defendant and the Defendant's principal were the only creditors to be paid back in full with interest. *Id.* at 176. None of these facts support a finding that the Defendant was an innocent investor. Having determined that the Debtor operated a Ponzi scheme, the Court will analyze the causes of action, applying the Ponzi scheme presumption where relevant.

III.    Actual Intent to Defraud

When a Ponzi scheme is found, the "Ponzi scheme presumption" applies, which is a recognized presumption of actual intent to defraud on the part of the transferor in the context of a Ponzi scheme under 11 U.S.C. § 548(a)(1)(A) and NY DCL § 276.[17] *See Sec. Inv'r Protec. Corp.*

---

[17] Pursuant to 11 U.S.C. § 544(b), the Trustee has the power to avoid transfers by the Debtor that are voidable by a creditor of the Debtor under applicable New York law.

*v. Bernard L. Madoff Inv. Sec. LLC*, No. 20 CV. 3140 (JGK), 2021 WL 1141638, at *11

(S.D.N.Y. Mar. 24, 2021); *Barnard v. Albert (In re Janitorial Close-Out City Corp.)*, Adv. P.

No. 11-8952 (AST), 2013 WL 492375, at *5 (Bankr. E.D.N.Y. Feb. 8, 2013).

Section 548(a)(1)(A) of the Bankruptcy Code provides:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

11 U.S.C. § 548(a)(1)(A).

NY DCL § 276 states that "[e]very conveyance made and every obligation incurred with

actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either

present or future creditors, is fraudulent as to both present and future creditors.[18] *McCord v. Ally*

*Fin., Inc. (In re USA United Fleet, Inc.),* 559 B.R. 41, 61 (Bankr. E.D.N.Y. 2016)*.* The reasoning

underpinning the presumption is that a Ponzi scheme demonstrates "actual intent" as matter of

law because "transfers made in the course of a Ponzi scheme could have been made for no

purpose other than to hinder, delay or defraud creditors." *In re Manhattan Inv. Fund Ltd.*, 397

B.R. at 8; *see also McHale v. Boulder Cap. LLC (In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 72

(Bankr. S.D.N.Y. 2010) (citing *In re Manhattan Inv. Fund Ltd.,* 397 B.R. at 14 ("If the Ponzi

---

[18] The NY DCL was later amended by the enactment of the "Uniform Voidable Transactions Act" ("UVTA") on December 6, 2019, effective April 4, 2020, N.Y. Legis. 580 § 7 (2019). The UVTA included an amendment to the fraudulent transfer provisions such as NY DCL §§ 273-276. However, the amendments do not apply in this adversary proceeding because the transfers occurred before the effective date of the UVTA. *Halperin v. Morgan Stanley Inv. Mgmt. (In re Tops Holding II Corp.),* 646 B.R. 617, 641 at n. 37 (Bankr. S.D.N.Y. 2022), *Ray v. Ray,* 799 F.App'x 29, 31 n.1 (2d Cir. 2020).

scheme presumption applies, actual intent for purposes of section 548(a)(1)(A) is established 'as a matter of law'")). The court in *Armstrong v. Collins* explained:

> [o]ne can infer an intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.

*Armstrong v. Collins*, No. 01 Civ. 2437 (PAC), 2010 WL 1141158, at *21 (S.D.N.Y. Mar. 24, 2010) (citing *Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.),* 280 B.R. 103, 110 (Bankr. E.D. Pa. 2002)).

Section 548 (a)(1)(A) of the Code is related to NY DCL § 276 for purposes of a finding of actual intent."[Section 548(a)(1)(A)] and [NY DCL § 276] essentially overlap; that is, where a transfer is found to be the result of actual intent to hinder, delay, or defraud creditors under New York law, it is also fraudulent under § 548(a)(1)(A)." *In re Janitorial Close-Out City Corp.*, 2013 WL 492375, at *5. As in § 548(a)(1)(A) of the Code, actual intent to defraud under § 276 is also presumed where a Ponzi scheme is involved. *See, e.g., In re Bayou Group, LLC,* 362 B.R. at 633–34. Further, under NY DCL § 276, it is the transferor's intent that is relevant, not the intent of the transferee. *See Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 432–33 (Bankr. S.D.N.Y. 2011). Courts have found that the entire transfer may be avoided after a finding of actual fraudulent intent under § 548(a)(1)(A) of the Code or NY DCL § 276. *See In re Bayou Group, LLC*, 439 B.R. 284, 304 (S.D.N.Y. 2010) ("A transfer that constitutes an actual or intentional fraudulent conveyance under Section 548(a)(1)(A) may be avoided in its entirety—as

to both invested principal and profits—whether or not the debtor received value in exchange for the transfer"). !!

   (1) <u>Actual Intent under section 548(a)(1)(A) of the Code</u>

Section 548(a)(1)(A) states that the period of time for examining fraudulent transfers is within two years of the filing of the petition. The involuntary petition was filed against the Debtor on April 14, 2020 and therefore the "lookback period" is from April 14, 2018 to April 14, 2020. During this time period, only DFC-NJ made payments to the Defendant. DFC-NJ made the following five transfers:

1.  4/23/2018 in the amount of $10,541.66

2.  5/23/2018 in the amount of $10,458.33

3.  6/7/2018 in the amount of $25,000.00

4.  6/21/2018 in the amount of $10,270.83

5.  7/23/2018 in the amount of $10,083.33

Pl.'s Ex. 10.

Therefore, a total of $66,354.15 is avoidable under the ninth cause of action.

   (2) <u>Actual Intent under section 276 of the NY DCL</u>

Actual intent to defraud has also been established under section 276 of the NY DCL. As stated above, a finding of actual intent under section 548 of the Code satisfies the actual intent requirements under section 276 of the NY DCL. The record and facts before the Court indicate that the Debtor operated as a Ponzi scheme by using itself and its affiliate entities to entice investors to invest in its fraudulent financing scheme. Therefore, the Ponzi scheme presumption establishes the Debtor's actual intent to hinder, delay, or defraud for purposes of section 276. A

finding of actual intent to defraud under section 276 permits the Court to avoid the entire amount

of the transfer. Therefore, a total of $1,322,714.00 is avoidable under the fourth cause of action.

IV.    The Plaintiff is Entitled to Attorney's Fees Under NY DCL § 276-a

Pursuant to the fifth cause of action, the Trustee seeks an award equal to the reasonable

amount of attorney's fees incurred in connection with prosecution of the fourth cause of action

under NY DCL § 276. *See UrbanAmerica, L.P. II v. Carl Williams Group, L.L.C.*, 945 N.Y.S.2d

233, 236 (App. Div. 1st Dep't 2012) (finding that NY DCL § 276–a does not entitle plaintiff to

recover all of its attorneys' fees in a litigation, but rather only fees relating to prosecuting the

cause of action for actual fraudulent conveyance). Under New York law, a successful avoidance

of intentional fraudulent conveyances may entitle the plaintiff to an award of attorney's fees.

NY DCL § 276-a provides:

> In an action . . . brought by a creditor . . . [or] trustee in bankruptcy . . . to set aside
> a conveyance by a debtor, where such conveyance is found to have been made by
> the debtor and received by the transferee with actual intent, as distinguished from
> intent presumed in law, to hinder, delay or defraud either present or future creditors,
> in which action . . .  the creditor . . .  [or] trustee in bankruptcy . . .  shall recover
> judgment, the justice ... presiding at the trial shall fix the reasonable attorney's fees
> of the creditor . . .  [or] trustee in bankruptcy . . . in such action . . . and the creditor
> . . . [or] trustee in bankruptcy . . . shall have judgment therefor against the debtor
> and the transferee who are defendants in addition to the other relief granted by the
> judgment.

NY DCL § 276–a; *see also Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re*

*Allou Distrib., Inc.),* 446 B.R. 32, 74 (Bankr. E.D.N.Y. 2011).

The Second Circuit has concluded that actual fraudulent intent on the part of both the

transferor and the transferee must be found before awarding attorney fees. *Carey v. Crescenzi*,

923 F.2d 18, 21 (2d Cir. 1991). Further, actual fraudulent must be found, not merely constructive

or imputed fraud:

> when [a] conveyance is found to have been made by the debtor and received by the
> transferee with actual intent, as distinguished from intent presumed in law, to

hinder, delay or defraud either present or future creditors . . . the court must make an explicit finding of actual intent to defraud; imputed fraud does not satisfy § 276–a.

*Kramer v. Mahia (In re Khan)*, Adv. P. No. 11-01520 (ESS), 2014 WL 10474969, at *48 (E.D.N.Y. Dec. 24, 2014) (quoting *Carey v. Crescenzi,* 923 F.2d at 21). This Court may consider "badges of fraud" as evidence to satisfy the element of actual fraudulent intent under NY DCL§ 276-a. *In re Allou Distrib., Inc*., 446 B.R. at 75.

The Plaintiff has satisfied his burden of proving actual fraudulent intent on behalf of both the Debtor and the Defendant. Several badges of fraud are present with respect to the Defendant's conduct. As previously stated, Mr. Diamond and Mr. Weitzmann, the principals of the Debtor and the Defendant respectively, were very close friends for decades. Mr. Weitzmann's refusal to conduct any inquiry or investigation into Mr. Diamond or the Debtor prior to making the loans is a significant factor weighing in favor of a finding of actual fraudulent intent. Torac was treated differently than the other investors in that Torac did not receive the monthly interest payments, but instead received payments in varying amounts on an irregular basis. Torac was also paid back in full with interest, and paid for the Debtor's attorney's fees in connection with the initial phases of this bankruptcy case. Mr. Weitzmann loaned Mr. Diamond and his businesses hundreds of thousands of dollars as well, and like Torac, Mr. Weitzmann was paid back in full. The evidence paints a picture of Torac which is consistent with a willing participant in the scheme. While Mr. Weitzmann strenuously asserts his ignorance to the scam, his conduct belies his alleged lack of knowledge. This is sufficient for the Court to find that the Defendant, as transferee, acted with actual fraudulent intent. Therefore, the Plaintiff is entitled to an award of reasonable attorney's fees under NY DCL § 276-a. The dollar amount of the legal fees to be included in the judgment shall be limited to the fees incurred in connection

with the fourth cause of action only. Judgment shall be entered in favor of the Plaintiff with respect to the fifth cause of action in an amount to be determined upon submission of an application for fees by the Plaintiff.

V.    Constructive Fraudulent Conveyances under NY DCL

The first three causes of action concern the "constructive fraudulent conveyance" statutes of the NY DCL. None of these statutes require a finding of fraudulent intent by the transferee. As stated by the court in *Sharp Int'l Corp v. St. Bank & Tr. Co. (In re Sharp Int'l. Corp.),* 403 F.3d 43, 53 (2d Cir. 2005), a transfer is constructively fraudulent under the NY DCL if it is made without fair consideration and: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.

The Debtor's insolvency is established by the Ponzi presumption. *In re Janitorial Close-Out City Corp.*, 2013 WL 492375 at *6. The Debtor was also demonstratively insolvent at the time of the transfers as set forth *infra*. Therefore, the requirement in each of these sections that the transferor is either insolvent, is engaged in a business with unreasonably small capital or that the transferor believes it will incur debt beyond its ability to pay is satisfied.

"Fair consideration" is a requirement for each of these sections as well and is defined in § 272 of the NY DCL as when "fair equivalent" is exchanged in good faith for the debtor's property. The Second Circuit has outlined the elements of "fair consideration" as follows:

> (1) the transferee must convey property in exchange for the transfer, or the transfer must discharge an antecedent debt:
> (2) what the transferee exchanges for the transfer must be of "fair equivalent" value to the property transferred by the debtor; *and*

(3) the transferee must make the exchange in "good faith."

*In re Sharp Int'l. Corp.,* 403 F.3d at 54 (citing *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1058-59 (2d Cir. 1995)).

With respect to the payments in excess of principal, the Trustee has established by a preponderance of the evidence that these payments were made without fair consideration because they were not made for fair equivalent value. *See In re Dreier LLP*, 452 B.R. at 445 (interest payments made in excess of principal to hedge fund investor in connection with debtor's Ponzi scheme could constitute constructive fraudulent conveyances). There was no fair equivalent value as the Debtor received nothing in return for these payments.

In addition to the payments in excess of principal, the Plaintiff seeks to recover an amount equal to the principal, notwithstanding the fact that the Debtor received equivalent value based on the Defendant's loans. According to the Plaintiff, the exchanges between the Debtor and Torac were not made in good faith. Under the NY DCL, the Plaintiff has the burden of establishing by a preponderance of the evidence that the Defendant lacked good faith. *Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005) (citing *U.S. v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994)).

Good faith is recognized as an "elusive concept" in the New York constructive fraud statutes, especially where the intent of the transferor is not relevant. *In re Sharp Int'l. Corp.*, 403 F.3d at 54 (citing *U.S. v. McCombs*, 30 F.3d at 326 n. 1). Courts uniformly recognize that repayment of a debt to an officer, director or shareholder of the transferee lacks good faith. *Id.* (citing *Atlanta Shipping Corp., Inc. v. Chemical Bank* (*In re Atlanta Shipping Corp., Inc.*), 818 F.2d 240, 248-49 (2d Cir. 1987)). The Second Circuit has also held that where the debtor makes a transfer to satisfy a valid antecedent debt, the fact that the transferee knows that the debtor

35

obtained the funds fraudulently to repay the obligation does not satisfy the lack of good faith requirement. *Id.* at 55. These types of transfers are not avoidable under the NY DCL as constructively fraudulent conveyances because they do not reflect the purpose of the New York fraudulent conveyance statutes: the purpose of the New York fraudulent conveyance laws "is not to provide equal distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of a debtor's property." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) (citing *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1508 (1st Cir. 1987)). Therefore, the preferential repayment of pre-existing obligations to some creditors at the expense of other creditors are not fraudulent conveyances, because *some* creditors have been repaid. *In re Dreier LLP*, 452 B.R. at 443.

Within these parameters, there is room to find that the repayment of a pre-existing debt is a constructive fraudulent conveyance even if the transferee is not an officer, director or major shareholder of the transferor at the time of the transfer. For example, the Second Circuit held that where a lender had knowledge at the time its transfer was made to the debtor that the funds advanced to the debtor might not be used to pay legitimate creditors, but instead may be funneled to third parties or used in a manner that does not benefit the debtor, a cause of action for constructive fraudulent conveyance may lie. *HBE Leasing*, 48 F.3d at 637. According to the *HBE Leasing* court, "[c]onstructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry." *Id*. at 636. The focus on what the debtor does with the initial loan proceeds and the lender's constructive or actual knowledge of the misuse of the funds was deemed relevant by the Second Circuit in *In re Atlantic Shipping Corp.* There, in connection with an appeal of a motion dismissing constructive

fraudulent conveyance claims under the NY DCL, the Second Circuit reasoned that if a lender "knew or strongly suspected" that the loan transaction would adversely affect a debtor's financial health and would hamper a debtor's ability to meet its other obligations, then a court could find that the loans were repaid in bad faith. *In re Atlantic Shipping Corp.,* 818 F.2d at 249.

The Defendant relies on the *Sharp* decision to support its position that the transfers to the Defendant were made in good faith. However, the facts of this case differ from *Sharp* and more closely resemble the *HBE* case. While the Defendant paints itself as an innocent investor which provided reasonably equivalent value in exchange for the transfers it received, the Defendant was by no means an innocent investor. As stated above, Mr. Weitzmann's close friendship with Mr. Diamond, along with his ownership interest in FFP and his general conduct during the Insolvency Period, precludes a finding of innocence. As a former owner of FFP, he is charged with the knowledge that FFP had little to no real function and that its main business was to take in investors' money and issue notes. As Mr. Weitzmann claimed he did not distinguish between the Debtor, DFC-NJ and FFP, he is charged with the knowledge that these other entities were mere window dressing for the Ponzi scheme. Therefore, every dollar advanced by Torac did not serve to improve the Debtor's financial health but went in large part to pay off new investors, thereby deepening the Debtor's insolvency. Under these circumstances, the Court finds that there was no fair consideration given for the transfers at issue as Torac did not take such transfers with the requisite good faith. Therefore, the Court shall enter judgment in favor of the Plaintiff under the first, second and third causes of action in the amount of $582,713.83.

VI.    <u>Constructive Fraudulent Conveyances Under the Bankruptcy Code</u>

In addition to the constructive fraudulent conveyance claims under the NY DCL, the Plaintiff seeks to recover certain transfers made within two years of the Petition Date pursuant to

§ 548(a)(1)(B) as set forth in the eighth cause of action. The dollar amount of the transfers sought to be avoided is $66,354.15  and each transfer was made by DFC-NJ. This section provides that the trustee may avoid a transfer of an interest in the debtor's property if the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer, and if the debtor received less than reasonably equivalent value in exchange for the transfer. *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 535 (1994). As discussed *infra*, the Court's finding that the Debtor operated a Ponzi scheme as well as the record before the Court establishes the insolvency of the Debtor during the relevant time frame. Whether a transfer is for reasonably equivalent value depends upon the circumstances of the transactions. *In re Actrade Fin. Tech. Ltd.*, 337 B.R. at 803. The good faith of the transferee is not an element of § 548(a)(1)(B). The transfers made during the two-year period prior to the Petition Date were not made for reasonably equivalent value based on the interest paid on the notes.

VII.    Application of the Good Faith Defense under Bankruptcy Code § 548(c)

The Answer contains an affirmative defense to the fraudulent conveyance claims under the Bankruptcy Code that the transfers were taken by Torac for value and in good faith. Once a *prima facie* case of actual or constructive fraudulent conveyance is made, as the Plaintiff has established in this case, Torac may defeat the claims by asserting the following affirmative defense under § 548(c) of the Bankruptcy Code:

> [A] transferee . . . of such a transfer . . . that takes for value and in good faith . . . may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).

The "good faith" requirement is not clearly defined by the courts, but there appears to be a consensus that it involves a three-step inquiry. *See In re Bernard L. Madoff Inv. Sec. LLC,*

12 F.4th 171, 191-92 (2d Cir. 2021) (finding that "good faith" imposes an "inquiry notice" standard under sections 548 and 550 of the Code). A defense under section 548(c) is an affirmative defense and the burden of persuasion is on the defendant-transferee. *Id.* at 196. First, the Court must examine the facts that the Defendant knew, which is a subjective standard. *Id.* at 191. Second, the Court must determine if the facts would have led a reasonable person, the Defendant, to conduct an inquiry into the Debtor's potential fraud, i.e., "inquiry notice." *Id.* Third, if the Court decides that the Defendant was put on inquiry notice, then the Court determines whether a diligent inquiry would have led the Defendant to discover the fraudulent nature of the transaction. *Id.* 191-92. The second and third steps impose an objective standard. *Id.* at 192. In essence, "inquiry notice 'signifies actual awareness of suspicious facts that would have led a reasonable [transferee], acting diligently, to investigate further and by doing so discover.'" *Id.* at 191 (quoting *Grede v. Bank of N.Y. Mellon Corp. (In re Sentinel Mgmt. Grp.)*, 809 F.3d 958, 961 (7th Cir. 2016)).

In other words, would a diligent investigation by Torac have disclosed the fraud or insolvency of the Debtor's operations? Torac has failed to establish that it took the transfers in good faith. First, as set forth *infra*, the principal of Torac would have had reason to know of the Debtor's fraudulent scheme.

Second, knowledge of these facts put the principal of Torac on inquiry notice of the potential fraud. The fact that the Defendant accepted payments from affiliated entities of the Debtor alone should have triggered additional inquiry as to why, for the two years prior to the Petition Date, all of the repayments came from DFC NJ. Further, the Debtor's inability to repay the Defendant when Mr. Weitzmann demanded payment would have led a reasonable person to conduct further inquiry.

Third, the principal of Torac did not undertake a reasonably diligent inquiry in the face of these red flags. Another investor in a similar situation would have made an inquiry once the Debtor could not honor the terms of the loans. Instead, Mr. Weitzmann did not undertake any investigation at all. Such conscious failure to make any inquiry into the Debtor's operations prevents the Defendant from asserting that it acted with the requisite good faith. *Id.* at 191-92. For these reasons, the Defendant's affirmative defense to the fraudulent transfers asserted pursuant to Bankruptcy Code § 548(c) fails.

VIII.   <u>The Transfers to the Defendant from the Non-Debtor Entities Are Recoverable Under 11 U.S.C. § 550</u>

Pursuant to the sixth cause of action, the Trustee asserts that the transfers from the non-Debtor entities, FFP and DFC-NJ, to the Defendant are recoverable pursuant to 11 U.S.C. § 550(a).

11 U.S.C. § 550(a) states:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
>> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

Once a transfer has been avoided, section 550(a) allows the trustee to "recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . . ." *Berman v. Pavano (In re Goldberg)*, 623 B.R. 225, 239 (Bankr. D. Conn. 2020) (quoting *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 464 B.R. 606, 613 (Bankr. S.D.N.Y. 2012)). "Section 550(a) is a remedies section and defines the party from whom a

trustee may seek to recover property that is fraudulently transferred or the value or proceeds of such property." *In re Allou Distrib., Inc.,* 379 B.R. 5, 19 (Bankr. E.D.N.Y. 2007). Section 550(a)(1) provides that an "initial transferee" is liable for an avoided transfer, whiles section 550(a)(2) provides that "'any immediate or mediate transferee of such initial transferee'—that is, a subsequent transferee—may be liable for an avoided transfer." *Id.*

To the extent that the Trustee seeks to avoid the transfers from the Debtor to Torac, recovery can be had against Torac, as the initial transferee of such transfers, in the amount of $812,387 under the NY DCL. The funds in question are property of the Debtor which went directly to Torac. The Court includes in this amount the transfers of $150,000 to Torac which Torac claims was property of Mr. Brettholz. The Defendant urges the Court to carve out from the transfers $150,000 that Torac received from the Debtor because it was made to correct an error by Mr. Brettholz, who mistakenly transferred $150,000 to the Debtor instead of Torac. While the banking records reflect that Mr. Brettholz transferred $150,000 to the Debtor on the same date that the Debtor transferred $150,000 to Torac, there is no testimony from Mr. Brettholz to support this theory as to why these transfers took place. Without substantiating evidence, the Court cannot attribute this transfer to Mr. Brettholz directly. Therefore, there is no basis to deduct $150,000 from the amount the Trustee may seek to recover from the Debtor.

The remainder of the transfers the Trustee seeks to recover are the transfers by FFP and DFC-NJ to the Defendant for a combined total amount of $510,326.37. Included among these transfers are $195,350.01 in transfers from the Debtor to Basic. According to the Defendant, the transfers by Basic were in repayment of a note executed by Mr. Weitzmann in favor of the Debtor, not with respect to an obligation by the Debtor to the Defendant. However, the record reflects that the building owned by Torac was facing foreclosure emanating from a

real estate tax lien. Mr. Weitzmann borrowed money from Basic to satisfy Torac's debt. In fact, the funds borrowed from Basic were deposited with an account held by Torac. Any transfer by the Debtor in repayment of this obligation was for the ultimate benefit of Torac, thus satisfying the requirement that the payment be for the benefit of the defendant-transferee. *See Gowan v. Amaranth LLC (In re Dreier LLP),* 452 B.R. 451 (Bankr. S.D.N.Y. 2011) (quoting *Sec. Inv'r Protec. Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 314 (Bankr. S.D.N.Y. 1999) ("The key to pegging the entity for whose benefit the initial transfer was made has two sides: 1) the entity must be the intended beneficiary and 2) the intended benefit must originate from the initial transfer")). Further, no promissory note evidencing a debt owed by the Debtor to Mr. Weitzmann was produced. Therefore, the transfers by the Debtor to Basic are included in the transfers to be avoided.

The Plaintiff seeks to recover the entire amount which the Defendant received as an initial or subsequent transferee of FFP and DFC-NJ. Pl.'s Post-Trial Br. at 37. As discussed, these transfers are avoidable as intentionally and constructively fraudulent transfers emanating from the Ponzi scheme pursuant to sections 273, 274, 275 and 276 of the NY DCL. The transfers from DFC-NJ are also avoidable in the amount of $66,354.15 under the intentional and constructive fraudulent conveyance statutes set forth in § 548 of the Code.

The Defendant asserts that because the funds transferred by FFP and DFC-NJ were from a separate legal entity, the Court must first find that the transfers from the Debtor to either FFP or DFC-NJ are avoidable, then determine whether the funds can be recovered from the Defendant as a subsequent transferee under Bankruptcy Code section 550(a)(2). For the reasons set forth, the Court finds that the Defendant was an initial transferee of the funds despite receiving the transfers from non-Debtor entities FFP and DFC-NJ. To Mr. Diamond and Mr.

Weitzmann, the Debtor and its affiliates operated as one unit for the purposes of the Ponzi scheme. The Debtor used FFP and DFC-NJ as intermediaries, but they were separate in name only. FFP and DFC-NJ were consolidated affiliates on the Debtor's balance sheet. FFP had no payroll, employee or operations and basically was a dormant business. DFC-NJ also had no independent employees or office space. Mr. Weitzmann even admitted that he did not differentiate between the three companies, he simply stated that he lent money to "Rob Diamond." Tr. #3 at 17. The Debtor and its affiliates, including FFP and DFC-NJ, operated in unison as an "enterprise." Therefore, based on the records before us, this Court makes no distinctions between the Debtor, FFP and DFC-NJ. After treating these entities as one unit, Torac cannot now assert that the transfers from the Debtor to FFP and DFC-NJ must be avoided before determining whether recovery can be had against Torac. The Debtor, FFP and DFC-NJ as one enterprise, made transfers to Torac as the initial transferee.

Other courts have relied on similar theories. *See Stoebner v. Ritchie Cap. Mgmt., LLC (In re Polaroid Corp.)*, 472 B.R. 22, 41 (Bankr. D. Minn. 2012) (finding Ponzi scheme presumption applied to related non-debtor entities where the person in common control "effects the transfer by the entity extrinsic to the Ponzi scheme . . . *in order to further the scheme* as it has been maintained *through the central entity"); In re RMA Strategic Opportunity Fund, LLC*, Adv. P. No. 19-1113 (FJB), 2021 WL 1439786, at *5 (Bankr. D. Mass. Apr. 15, 2021) (denying a motion to dismiss for trustee's lack of standing and finding that a plausible claim for relief was alleged where the trustee pled that a transfer was made "*by the [d]ebtor* and that the transferred funds constituted property of the [d]ebtor, notwithstanding that they were held in the name of another entity"); *Tango Delta Fin., Inc., v. Lowe (In re: Dickinson of San Antonio, Inc.)*, Adv. P No. 18-05259 (RBK), 2021 WL 3500781, at *17 (W.D. Tex. Aug. 9, 2021) (finding that third-party

transfers can be sufficient to allow a trustee to recover "an interest of the debtor in property" because where the debtor controls the disposition of funds from that third party, the money is treated as having belonged to the debtor).!

Even if the Court were to accept the argument that the initial transfer from the Debtor to FFP or DFC-NJ had to be avoided first, and the Defendant is a subsequent transferee, the Plaintiff's claims would still succeed. For the reasons stated *infra*, due to the application of the Ponzi presumption, each transfer from the Debtor to either FFP or DFC-NJ is avoidable as a constructively fraudulent transfer or an intentionally fraudulent transfer under each applicable cause of action. In addition, the funds from FFP and DFC-NJ to the Defendant can sufficiently be traced to the Debtor. While the Plaintiff has the burden of tracing the funds received by the Defendant to the Debtor to establish that the funds are property of the estate, it "is not so onerous as to require dollar-for-dollar accounting of the exact funds at issue." *In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 340 (Bankr. S.D.N.Y. 2011) (citing *In re Allou Distrib., Inc.,* 379 B.R. at 30).

1. Tracing of funds for FFP and DFC-NJ

   a. FFP

The Defendant executed a promissory note in favor of the Debtor on July 16, 2014 in the amount of $100,000. Pl.'s Ex. 68. However, these funds were wired into FFP instead of the Debtor. *Id.* In return, FFP transferred a total of $190,000 to the Defendant. Pl.'s Ex. 12. Therefore, the net amount received by the Defendant was $90,000. Between January to November of 2015, when the Defendant received these funds, FFP received sixteen total deposits totaling $489,954. Mr. Shurek was able to trace $325,000, constituting 66% of the funds transferred to FFP as originating with the Debtor. Pl.'s Ex. 1. Of the sixteen payments to the

Defendant, $90,000 was traced to the Debtor. Another seven of the transactions to the Defendant cleared the bank even though the account balance was negative. *Id.* The Plaintiff has met his burden of showing that the funds FFP paid to the Defendant originated with the Debtor and are property of the estate.

### b. DFC-NJ

The Defendant executed two promissory notes in favor of DFC-NJ which were deposited in DFC-NJ on April 16, 2014 and June 18, 2014 in the amount of $100,000 and $120,000, respectively. Pl.'s Exs. 10, 69. In return, DFC-NJ transferred a total of $320,326.37 to the Defendant. Pl.'s Ex. 10. Therefore, the net amount received by the Defendant was $100,326.37. Mr. Shurek was able to determine that $1,055,648, or 26% of the money that was transferred to DFC NJ between July 24, 2014 and July 23, 2018 came from the Debtor. Of the fifty-three payments to the Defendant, he determined that five payments totaling $38,270 could be directly traced to the Debtor around the date that funds were disbursed to the Defendant. The Plaintiff has met his burden of showing that the funds DFC-NJ paid to the Defendant also originated with the Debtor and are property of the estate.

### 2. Good faith defense of subsequent transferee

The Defendant also asserts that because it is a subsequent transferee, it is not liable under section 550(b)(1) of the Code as it took the funds in "good faith." Def.'s Post-Trial Br. at 25.

Section 550(b) of the Code states:

(b) The trustee may not recover under section (a)(2) of this section from—

> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided[.]

11 U.S.C. § 550(b)(1).

The Defendant, which has the burden of proof for this defense, cannot establish that it took the funds from FFP and DFC-NJ in good faith.

a.   <u>"Good Faith"</u>

As discussed in accordance with the Defendant's section 548(c) defense, the "inquiry notice" standard for "good faith" is substantially similar to section 550(b) of the Code. *See In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171 at 192 ("a lack of good faith under Sections 548 and 550 of the Bankruptcy Code encompasses an inquiry notice standard.")

The Defendant alleges that it received the transfers in good faith because it had the same information as Mr. Moskowitz and Mr. Wattenberg. Def.'s Post-Trial Br. at 26. In essence, the Defendant argues that no inquiry was required because the ten percent interest rates on the notes were not exorbitant, the Debtor's business was plausible, and that no excessive profits were promised. *Id.* The Defendant fails to consider other facts that would have put a reasonable person on inquiry notice.

For similar reasons that the good faith defense under section 548(c) fails, the defense under section 550(b) also fails. Not only did the Defendant have reason to inquire into the Debtor's operations and ability to pay at the time the Defendant made its loans, but it also had failed to inquire into several red flags that presented themselves in the subsequent years. The Defendant had knowledge that the Debtor was unable to make the demanded payments that were owed to the Defendant pursuant to the promissory notes, was paid back from affiliate entities other than the Debtor and was unable to explain FFP's capitalization despite being a 50% owner at one point in time. The Defendant would have discovered the fraudulent purpose behind the transaction upon making an inquiry, but the Defendant affirmatively decided to refrain from conducting any inquiry. The Defendant provided $75,000 to Mr. Diamond shortly before the

involuntary petition was filed, did not ask any questions about the Debtor's ability to pay, and had not performed even a modicum of due diligence into the financial affairs of the Debtor. The Defendant was on inquiry notice and failed to conduct any investigation into the Debtor, and so the good faith defense fails.

  b.  "Without knowledge of the voidability of the transfer avoided"

"[A] defense under 11 U.S.C. § 550(b) will arise only if the transferee takes without knowledge of the voidability of the transfer avoided." *In re Goldberg*, 623 B.R. at 240 (quoting *CNB Int'l v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 329 (Bankr. W.D.N.Y. 2008), *aff'd on other grounds*, 440 B.R. 31 (W.D.N.Y. 2010)). A section 550(b) defense fails when "an immediate or mediate transferee has knowledge of a potential basis for the avoidance." *In re CNB Int'l, Inc.*, 393 B.R. at 330 (quoting *Wallach v. Altmeyer (In re Altmeyer),* 268 B.R. 349, 357 (Bankr. W.D.N.Y. 2001)). "There must only be some knowledge of the possibility of avoidance . . .  [to] put [the transferee] on notice the transfer may be avoided or place him in a position where further inquiry is necessary and would likely lead to the conclusion the transfer might be avoided." *Mendelsohn v. Roslyn, LLC (In re Leff)*, 631 B.R. 106, 127 (Bankr. E.D.N.Y. 2021).

The facts indicate that the Defendant had knowledge about the possibility of avoidance of the transfer or was in a position where further inquiry was necessary. The Defendant knew that the Debtor received less than fair consideration for the transfers because the Debtor and its entities paid back the Defendant almost double the amount that it loaned. The facts show that the Defendant was paid back $1,322,713.83 on loans totaling $740,000.00. The Defendant was also in a position to inquire about the Debtor's insolvency. When the Defendant demanded repayment on one of its loans in 2015 and the Debtor advised it could not repay, that placed the Defendant

in a position to inquire as to the Debtor's solvency. Further, these same facts placed the Defendant in a position to inquire as to the Debtor's ability to pay its debts as they came due. For these reasons, Defendant did not take the transfers "without knowledge of the voidability of the transfer avoided" as is required under section 550(b).

Therefore, the Defendant has not met its burden of proof to establish a defense under § 550(b).

IX.    <u>Award of Prejudgment Interest</u>

The Plaintiff makes a request in its complaint and its post-trial brief for prejudgment interest. Neither the NY DCL nor the Bankruptcy Code expressly provides for an award of prejudgment interest under a fraudulent conveyance claim, but discretionary awards of prejudgment interest are permissible. *45 John Lofts, LLC v. Meridian Cap. Grp., LLC (In re 45 John Lofts, LLC)*, 650 B.R. 602, 621 (Bankr. S.D.N.Y. 2023). While an award of prejudgment interest must not create a windfall for the plaintiff, prejudgment interest is appropriate "absent a sound reason to deny it." *Id.* (citing *McHale v. Boulder Cap. LLC (In re 1031 Tax Grp., LLC)*. 439 B.R. 84 87 (Bankr. S.D.N.Y. 2010)). Having determined that Torac was not an innocent investor and the Debtor should be compensated for the value of the property transferred, the Court awards interest at the prime rate in effect at the time of the transactions, which interest shall begin to accrue as of the date this adversary proceeding was commenced. *Id.* at 621-22 (other citations omitted).

## **CONCLUSION**

The Court finds in favor of the Plaintiff as to each cause of action and shall settle a proposed judgment consistent with this Decision After Trial on notice to counsel to the Defendant as follows:

1. Judgment in favor of the Plaintiff pursuant to 1st, 2nd and 3rd causes of action under NY DCL §§ 273, 274, and 275 in the amount of $582,713.83;

2. Judgment in favor of the Plaintiff pursuant to 4th cause of action under NY DCL § 276 in the amount of $1,322,713.83;

3. Judgment in favor of the Plaintiff pursuant to 5th cause of action under NY DCL § 276-a in an amount to be determined after submission of an application for fees by the Plaintiff;

4. Judgment in favor of the Plaintiff pursuant to 6th cause of action under 11 U.S.C. § 550 in the amount of $812,387.46 paid to the Defendant from Debtor, $320,326.37 paid to the Defendant from DFC-NJ, and $190,000.00 paid to the Defendant from FFP;

5. Judgment in favor of the Plaintiff pursuant to 7th cause of action under 11 U.S.C. § 551, avoiding each transfer for the benefit of the Debtor's estate;

6. Judgment in favor of the Plaintiff pursuant to 8th cause of action under 11 U.S.C. § 548(a)(1)(B) in the amount of $66,354.15; and

7. Judgment in favor of the Plaintiff pursuant to 9th cause of action under 11 U.S.C. § 548(a)(1)(A) in the amount of $66,354.15.

8. The judgments shall include interest at the prime rate as of the date of each transfer, accruing from the date of the commencement of this adversary proceeding. The dollar amount shall be calculated up to the date of this Decision After Trial.



Dated: Central Islip, New York
February 22, 2024

Robert E. Grossman
United States Bankruptcy Judge